IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

No. 16-0844

FILED
**October 27, 2017**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IPACESETTERS, LLC,
Garnishee Below, Petitioner

v.

KACE DOUGLAS and RANDI DAMPHA, *et al.*
Plaintiffs Below, Respondents

Appeal from the Circuit Court of Brooke County
Honorable Jason A. Cuomo, Judge
Civil Action No. 10-C-33

AFFIRMED

Submitted: October 3, 2017
Filed: October 27, 2017

Ancil G. Ramey, Esq.                   James F. Companion, Esq.
Hannah C. Ramey, Esq.                  Yolanda G. Lambert, Esq.
Stacey L. Richards-Minigh, Esq.        Schrader, Byrd & Companion PLLC
Steptoe & Johnson PLLC                 Wheeling, West Virginia
Huntington, West Virginia              and
Counsel for the Petitioner             Brent W. Wolfinbarger, Esq.
                                       Charles Town, West Virginia
                                       Counsel for the Respondents

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "'It is the general rule that a plaintiff can recover on a suggestion only when the garnishee is liable to the defendant [debtor].' Syl. pt. 1, in part, *Emmons-Hawkins Hardware Company v. Sizemore*, 106 W.Va. 259, 145 S.E. 438 (1928)." Syl. Pt. 1, *Waco Equip. Co. v. B.C. Hale Const. Co., Inc.*, 182 W.Va. 381, 387 S.E.2d 848 (1989).

2. "It is the province of the court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937).

LOUGHRY, Chief Justice:

The petitioner, iPacesetters, LLC ("petitioner"), seeks relief from the circuit court's August 11, 2016, order through which it denied the petitioner's motion to dismiss and awarded summary judgment in favor of the respondents, Kace Douglas and Randi Dampha, individually and on behalf of others ("respondents"), in this ancillary statutory proceeding in aid of collection on a judgment. Asserting it was statutorily entitled to a jury trial and that summary judgment was in error due to a material issue of fact, the petitioner seeks a reversal and either entry of judgment in its favor or a remand for further proceedings before the circuit court. Upon our review of the parties' briefs, the arguments of counsel, the appendix record submitted, and the applicable law, we affirm the circuit court's summary judgment ruling.

## I. Facts and Procedural Background

This appeal arises out of a proceeding in aid of execution against the petitioner brought by the respondents under West Virginia Code § 38-5-10 (2011 & Supp. 2017).[1] The

---

[1]West Virginia Code § 38-5-10 provides, in part, as follows:

> (a) Upon a suggestion by the judgment creditor that a person is indebted or liable to the judgment debtor or has in the person's possession or control personal property belonging to the judgment debtor, which debt or liability could be enforced when due, or which property could be recovered when it became

(continued...)

1

respondents were previously awarded a judgment against their employer, Tele-Response Center, Inc. ("Tele-Response"), on September 7, 2011, in a class action alleging violations of the West Virginia Wage Payment and Collection Act.[2] Tele-Response's appeal of that judgment was ultimately dismissed in January 2013 due to its inability to post an appeal bond.

A little more than two months after judgment was entered in favor of the respondents on their underlying claim, the petitioner entered into a series of agreements with Tele-Response, TRC Acquisitions Corp. ("TRC"), and Telestar Marketing, Inc. ("Telestar") on November 30, 2011.[3] Through an Asset Purchase Agreement, the petitioner acquired

---

[1](...continued)
> returnable by the judgment debtor in a court of law and which debt or liability or property is subject to the judgment creditor's writ of fieri facias, a summons against such person may be issued . . . requiring such person to answer the suggestion in writing and under oath.

The 2017 amendments to this statute did not substantively alter subsection (a).

[2]*See* W.Va. Code Code §§ 21-5-1 to -18 (2013 & Supp. 2016). The judgment consisted of liquidated damages in the amount of $213,310.38; prejudgment interest in the amount of $22,932.79; litigation costs in the amount of $6,992.27; attorney fees in the amount of $92,740; and post-judgment interest that now exceeds $100,000.

[3]TRC is the parent company of Telestar and Tele-Response. Jason Fine, the sole shareholder of TRC, became the petitioner's chief operating officer after entering into these agreements.

2

substantially all of Telestar's assets.[4] Under a Services Agreement,[5] Tele-Response provided services to the petitioner for which it invoiced the petitioner at least once each month for the costs it incurred in providing those services. During the August 19, 2013, hearing held below, Gerald DeBiasi, the petitioner's executive chairman, testified,[6] describing these services as Tele-Response giving the petitioner the "use of the facilities, use of the systems, use of the equipment, use of the furnishings, the work stations, et cetera. That is the services they [Tele-Response] are providing in the Services Agreement." The petitioner had the option to acquire the assets of Tele-Response "free and clear of all Liens" at the end of the term of the Services Agreement.[7]

The Services Agreement also required the petitioner to make scheduled payments to Tele-Response, as set forth in paragraphs 1(b)(i), (ii), and (iii), over a two-year

---

[4]As part of its acquisition of Telestar, the petitioner paid $800,000 to TRC for distribution to its shareholders. TRC's sole shareholder was Mr. Fine.

[5]The Services Agreement states, in part, that "to induce iPacesetters to enter into the [Asset] Purchase Agreement, [Tele-Response], which has heretofore provided services to Telestar, has agreed to provide to iPacesetters certain services during the period specified herein following the date hereof."

[6]All references herein to Mr. DeBiasi's testimony are to his testimony given during this August 19, 2013, hearing, which was an interrogatory proceeding in aid of execution. In addition to Mr. DeBiasi, the petitioner's chief financial officer, Michael Kennedy, also appeared on behalf of the petitioner during this hearing. No one appeared on behalf of Tele-Response, nor did any other lien holders appear.

[7]The Services Agreement provides that it was to remain in effect until November 30, 2013, unless there was a default or the parties agreed in writing to extend the agreement.

3

period totaling $1,250,000. These payments were described as a "mark-up" or "cost plus" on the services being provided by Tele-Response.[8] The paragraph 1(b)(i) payment was made by the petitioner prior to its receipt of the respondents' suggestion and is not in contention in this proceeding. The petitioner's $500,000 payment to Tele-Response under paragraph 1(b)(ii), which was to be made on November 30, 2012, or within thirty days thereafter, was restricted by paragraph 1(c) of the agreement in that it would "only be made if and at such time as all outstanding liabilities (fixed, contingent, liquidated, unliquidated or otherwise) and other obligations of [Tele-Response] . . . including, but not limited to, all federal and state tax claims, litigation claims and all claims of others have been fully and finally discharged . . . ." Mr. DeBiasi testified that this particular payment was never remitted by the petitioner because Tele-Response did not meet the requirements of paragraph 1(c).

Regarding the $250,000 payment under paragraph 1(b)(iii) of the Services Agreement, Mr. DeBiasi testified that this payment was remitted to Tele-Response early[9] "[b]ecause of the difficult financial straights of Tele-Response" and "to provide for more

----

[8]Mr. DeBiasi testified below that

> in a typical cost-plus arrangement the buyer of services pays the seller of services, or the provider of services, their cost plus some sort of marginal markup on those services. And so we came up with . . . over the course of two years a markup or margin of 1 million 250 [$1,250,000].

[9]It appears from the appendix record that the petitioner remitted the $250,000 to Tele-Response in a series of payments of varying amounts between July 2012 and March 2013.

4

cash flow for their operations." In his affidavit signed three years later, Mr. DeBiasi stated

that this $250,000 was to be forwarded to entities with superior liens whom he identified as

the Internal Revenue Service ("IRS") and Joseph Dresnok. There is no provision in the

Services Agreement obligating the petitioner to pay either the IRS, Mr. Dresnok, or any of

Tele-Response's lien holders, creditors, or vendors.

A Proceeds Agreement was also entered into on November 30, 2011, "[a]s a

condition to and in order to induce iPacesetters to enter into each of the above agreements[.]"

This particular agreement contains additional covenants and agreements between these

entities and provides that

> TRC is advancing to Tele-Response, its wholly-owned
> subsidiary, (or Telestar is loaning to Tele-Response) the sum of
> monies for the purpose of settling all outstanding obligations of
> Tele-Response to the creditors set forth on Exhibit 1 hereto . . .
> . Each of Telestar, Tele-Response, TRC and [Jason] Fine
> represent and warrant that Exhibit 1 includes all existing
> creditors and claimants of any kind of Tele-Response (fixed,
> contingent, liquidated, unliquidated or otherwise) except for
> those creditors and claimants set forth on Exhibit 2 hereto.

Although not reflected on the face of Exhibit 1 to the Proceeds Agreement, Mr. DeBiasi

stated in his affidavit, which was attached to the petitioner's memorandum in opposition to

the respondents' motion for summary judgment, that the amount of $938,661 listed on

Exhibit 1 as "Federal Payroll Taxes- Valid Through Nov[.]" was an IRS lien, and that the

"Contingent Liabilities" in the amount of $1,070.000 on this exhibit "are believed to be in

reference to the claim of Joseph Dresnok, which claim was actually reduced to a judgment

5

against Tele-Response Center on April 5, 2011 in the amount of $1,101,624.87."[10]  No explanation is offered as to why a judgment lien would be listed as a "contingent liability," nor why the amounts would be different.  This same Exhibit 1 states "[t]he following table represents the complete Creditor and Contingent liabilities of Tele-Response and Telestar as [o]f October 31, 2011[,]" but it does not indicate which obligations belonged to Tele-Response and which were those of Telestar.  Although page two of the exhibit reflects that the federal taxes listed in the table were owed by Tele-Response, there is no further mention of the "Contingent Liabilities."

The respondents' judgment entered against Tele-Response more than two months earlier does not appear on any exhibit to any of these November 30, 2011, agreements.  The parties appear to have contemplated such an omission by including in the Proceeds Agreement an indemnification provision that states that if Tele-Response failed to list an obligation, Tele-Response, Telestar, TRC Acquisitions, and Mr. Fine would be required to indemnify the petitioner for satisfying the debt obligation.

---

[10]The Proceeds Agreement provides that at the time the parties closed on the Asset Purchase Agreement, the petitioner would pay $1,750,000 to Telestar under the Asset Purchase Agreement and $500,000 to Tele-Response under the Services Agreement, after which Telestar would advance to its wholly owned subsidiary, Tele-Response, "the sum of monies for the purpose of settling all outstanding obligations of Tele-Response to the creditors set forth on Exhibit 1."

In June 2012, the respondents served the petitioner with writs of execution on personal property in seeking to satisfy the judgment they had obtained against Tele-Response. On October 11, 2012, the respondents caused a suggestion of personal property to be served upon the petitioner in which they sought:

> Amounts and/or monies and/or debts and/or obligations and/or things of value owed and/or to be owed and/or due and/or to be due to Tele-Response Center, Inc., including, but not limited to, those described in the various agreements dated November 30, 2011 and/or as of November 30, 2012 where iPacesetters, LLC, and/or Tele-Response Center, Inc., and/or Telestar Marketing, Inc., and/or TRC Acquisition Corp., and/or Jason Fine and/or Teleservices Solutions Holdings, LLC, are parties such as the SERVICES AGREEMENT between Tele-Response Center, Inc. and iPacesetters, LLC, dated as of November 30, 2011.

The petitioner filed its verified answer to the suggestion on October 30, 2012, denying that it either owed any "amounts, monies or other things of value" to Tele-Response or had "debts and/or obligations due" to Tele-Response "[a]s of the date of the filing of this Answer[.]" The petitioner characterized the payments it owed to Tele-Response under the Services Agreement as a "contingent contractual obligation."[11] Documents produced by the petitioner show that several invoices were due around the time that the petitioner received the suggestion and filed its answer to the same. The petitioner's chief financial officer, Michael Kennedy, testified below that there were no outstanding invoices "due" on the date

---

[11]Mr. DeBiasi testified that Tele-Response "invoice[s] us for the Services Agreement typically on a monthly basis. It may . . . turn out to be a couple times a month, but we prefer monthly invoices."

7

the answer was filed, although he acknowledged that the petitioner had a contractual obligation to make payments to Tele-Response. On November 2, 2012, just a few days after the petitioner filed its answer to the suggestion, the petitioner remitted a payment of $51,000 to Tele-Response followed by another payment on November 13, 2012, in the amount of $154,263.31.

The appendix record contains a document produced by the petitioner, which is titled "Cost Plus Payments paid to Tele-Response Center, Inc. Per Services Agreement dated 11/30/11." This document reflects that after the suggestion was received, the petitioner made monthly payments to Tele-Response in varying amounts between November 2012 and July 2013, which totaled more than $2,000.000.

During the course of this proceeding, the respondents filed motions seeking to join the petitioner as a defendant, to make the petitioner liable for the respondents' judgment, and for sanctions. In its order entered on October 21, 2013, the circuit court denied the motion to join the petitioner as a defendant; granted the motion for sanctions; and granted, in part, the motion to make the petitioner liable for the respondents' judgment. The court found that the respondents' evidence was insufficient to demonstrate that the various agreements discussed above were fraudulent, but it also found that the conduct of the parties

8

reminded the court of a "'shell game.'"[12] Moreover, it was "disturbed by the conduct of both iPacesetters, LLC and Tele-Response in this case[,]" noting that it had "directed the *W.Va. R. Civ. P.* 30(b)(7) designated representative(s) of Tele-Response to appear at the August 19, 2013" hearing, yet no representative appeared, and that notwithstanding the respondents' suggestion, the petitioner continued to pay monies to Tele-Response. Although the circuit court ordered the petitioner to cease payments to Tele-Response, it appears from an exhibit attached to Mr. Debiasi's affidavit that the petitioner may have continued to make payments to Tele-Response through at least July 2014.

Following discovery in aid of execution, multiple dispositive motions, and various trial dates, the respondents filed a third motion for summary judgment on June 24, 2016, addressing the legal issues that had been previously identified by the parties and asserting there were no factual issues for a jury to resolve. On July 11, 2016, the petitioner filed a motion to dismiss and response to the motion for summary judgment. By order entered August 11, 2016, the circuit court denied the petitioner's motion to dismiss and

---

[12]In this regard, the circuit court further found in this order that

> there is an inference that on July 27, 2012, a representative of iPacesetters, LLC at its Weston, West Virginia location, advised law enforcement during the execution of the Writ for Suggestion that there was no property owned by Tele-Response at that facility. But according to the testimony elicited from Mr. Kennedy, to his knowledge, the property located at that facility was owned by Tele-Response.

9

awarded summary judgment in favor of the respondents, directing the petitioner to pay to the respondents the amount of their judgment against Tele-Response.[13] The court found that the facts regarding the debts, liability, and payments of the petitioner to Tele-Response had been developed through discovery, making trial unnecessary; that whether the petitioner's payments to Tele-Response were fixed or contingent was a question of law for the court to decide; and that West Virginia Code § 38-5-18 (2011)[14] did not supersede the court's "role and duty under Rule 56 of the West Virginia Rules of Civil Procedure to decide questions of law . . . ."[15] The circuit court concluded that the petitioner's obligation to make the payments to Tele-Response was fixed and the fact that the petitioner did not know the specific amount of the monthly obligation in advance did not make the contractual obligation contingent. The circuit court further ruled that even if the sums the petitioner owed to

[13]*See supra* note 2.

[14]West Virginia Code § 38-5-18 provides, in part, that

> [w]hen it is suggested by the judgment creditor in any case of suggestion that the person suggested has not fully disclosed the debts or liabilities due by the person to, or personal property in the person's possession or under the person's control of, the judgment debtor at the time of service of the summons, or has not delivered to the officer the property, or paid the money, for which the person was liable, the court shall cause a jury to be impaneled, without any formal pleadings, to inquire as to the debts or liabilities or property, or as to the payment or delivery[.]

[15]*See* W.Va. R. Civ. P. 56(c) (providing, in part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

Tele-Response were for debts that Tele-Response owed to third-party vendors, those payments were not insulated from the suggestion proceedings; that the petitioner's obligation was to Tele-Response—not to Tele-Response's lien holders or other creditors; and that because there was no evidence that any of Tele-Response's other creditors had attempted garnishment proceedings against the petitioner, the petitioner was not a "party" to any other such lien. This appeal followed.

## II. Standard of Review

Our review of the circuit court's summary judgment order is plenary. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*."). Against this standard, the parties' arguments will be considered.

## III. Discussion

The petitioner asserts that the circuit court erred in awarding summary judgment in favor of the respondents because its contractual obligations to Tele-Response were not subject to the respondents' suggestion and because there were liens against Tele-Response that were superior to the respondents' judgment lien. The petitioner further argues that summary judgment was improper because it was entitled to a jury trial under West Virginia Code § 38-5-18. We address these issues below.

11

**A. Whether the contractual obligations between the petitioner and Tele-Response were "fixed" or "contingent" and whether there were superior liens**

The petitioner argues that the circuit court erred in ruling that the payments it made to Tele-Response under the Services Agreement were "reachable" by the respondents' suggestion. Asserting that all of its payments to Tele-Response were contingent upon Tele-Response providing services and submitting invoices with supporting documentation, the petitioner adds that if third-party vendors provided no services to Tele-Response, there was no obligation for any payment and the petitioner "bore no liability." The petitioner further argues that these contingent payments were not property to which Tele-Response had a present interest, but were payments for Tele-Response to pass on to third-party vendors.[16] Lastly, the petitioner asserts that it was obligated under the various agreements discussed above to make payments to satisfy certain tax and judgment liens against Tele-Response that had superior priority over the respondents' subsequent judgment against Tele-Response.

Conversely, the respondents argue the petitioner's obligation to remit monthly payments to Tele-Response was fixed because while the amount of monthly invoices changed, the petitioner's obligation to remit those amounts did not. Regarding superior lien

---

[16]The petitioner argues, in part, that it properly denied owing any money to Tele-Response in its answer to the suggestion because a third-party looks to what is due to the judgment debtor *at the time the suggestion is served*. Mr. Kennedy testified that he looked to whether any invoices from Tele-Response were due *on the date he filed the petitioner's answer to the suggestion*. The appendix record contains copies of invoices to the petitioner from Tele-Response which were due around the time the petitioner received the suggestion and when it filed its answer to the same.

12

holders, the respondents assert that the petitioner never stated in its answer to the suggestion that the garnishment was unenforceable due to the existence of superior tax or judgment liens against Tele-Response and, if other liens against Tele-Response exist, payment of those liens was the sole responsibility of Tele-Response, Telestar, and TRC.

We begin by observing that "[g]arnishment is an ancillary statutory proceeding which has long been resorted to in aid of the collection of judgments. Its purpose is to divert to the judgment creditor a payment due the judgment debtor by a third person." *Emmons-Hawkins Hardware Co. v. Sizemore*, 106 W.Va. 259, 261, 145 S.E. 438, 439 (1928). Further, "'[i]t is the general rule that a plaintiff can recover on a suggestion only when the garnishee is liable to the defendant [debtor].' Syl. pt. 1, in part, *Emmons-Hawkins Hardware Company v. Sizemore*, 106 W.Va. 259, 145 S.E. 438 (1928)." Syl. Pt. 1, *Waco Equip. Co. v. B.C. Hale Const. Co., Inc.*, 182 W.Va. 381, 387 S.E.2d 848 (1989). There is no question that the petitioner was contractually liable to Tele-Response, but our inquiry does not end there. We must determine whether the circuit court was correct in its determination that the petitioner's contractual obligations to Tele-Response were fixed because "[a] contingent liability, *ex contractu*, is not subject to an order of attachment and garnishment." Syl. Pt. 4, *M.W. Kellogg Co. v. Concrete Accessories Corp.*, 157 W.Va. 763, 204 S.E.2d 61 (1974). Further, the "debt from the garnishee to the defendant, in respect of which it is sought to charge the former, must . . . be absolutely payable, at present, or in future and not dependent on any contingency." *Strauss v. Railroad Co.*, 7 W.Va. 368, 374 (1874).

13

We have previously addressed the question of whether a debt or claim is fixed or contingent.  As we explained in *Commercial Bank of Bluefield v. St. Paul Fire and Marine Insurance Co.*, 175 W.Va. 588, 336 S.E.2d 552 (1985),

> [i]n general, a debt or claim which is uncertain or contingent, in the sense that it may never become due and payable, is not garnishable. . . .  A contingent interest is one in which liability is not certain and absolute, but depends upon some independent event. . . .

> The split of authorities is on the question of whether debts for which liability is fixed but for which payment is not yet due (unmatured debts) or the amount owed is not yet determined (unliquidated debts) are subject to post-judgment garnishment under the language of the statute in the jurisdiction. The weight of, and, in our opinion, the better reasoned, authorities view such debts as not being "contingent," and as being subject to garnishment because a "contingency" which will render a debt or claim not subject to garnishment is one that affects the debt itself, as distinguished from one that affects only its amount or the time or manner of its payment. 6 Am.Jur.2d *Attachment And Garnishment* § 126 (1963).  This distinction was stated in the following manner in *Johnson v. Johnson*, 111 R.I. 183, 188, 300 A.2d 642, 645 (1973) (collecting cases at n. 1):

> > Garnishment is allowed on an unliquidated claim where there is a certainty as to liability but a contingency as to amount. Where an obligation to pay exists, even though the amount of that obligation is undetermined, garnishment will lie where the amount is capable of definite ascertainment by the contract, or by the facts then known, or by testimony to be taken.

> • • • •

14

> *W.Va. Code*, 38-5-10 [1931] clearly provides for the garnishment of unmatured debts: ". . . which debt or liability could be enforced, when due, or which property could be recovered, when it became returnable[.]"

*Commercial Bank of Bluefield*, 175 W.Va. at 594, 336 S.E.2d at 557-58. We continue to be of the opinion that this is the better-reasoned approach.[17]

We agree with the circuit court's conclusion that the only contingent obligation under the Services Agreement was the $500,000 payment under paragraph 1(b)(ii) and that there were no other contingencies either in that agreement, the Proceeds Agreement, or the Letter Agreement. This particular payment would only be made if Tele-Response provided proof to the petitioner that it had fully and finally discharged all of its outstanding liabilities, obligations, debts, and claims. There was no such contingency attached to the $250,000 payment under paragraph 1(b)(iii).

---

[17]The cases relied upon by the petitioner involved contingent obligations. For example, in *Waco Equipment Company v. Hale Construction Company, Inc.*, 182 W.Va. 381, 387 S.E.2d 848 (1989), several creditors of a construction subcontractor sought to suggest the retainage being held by the general contractor. This Court affirmed the circuit court's ruling that the retainage had been appropriately used to release liens filed by materialmen who had not been paid by the subcontractor. Because the subcontractor left the project with outstanding debts and liens associated with the subcontract, there was no debt owed by the general contractor to the subcontractor that a judgment creditor could suggest. While this reasoning would apply to the payment under paragraph 1(b)(ii) of the Services Agreement, it would not apply to the payment under paragraph 1(b)(iii) nor to the monthly obligations between the petitioner and Tele-Response, which were routine and on-going both before and after the suggestion was served with only the monthly amounts varying.

15

Turning to the petitioner's other obligations to Tele-Response under the Services Agreement, "'[i]n order to attach a debt due in the future it must be a certain debt which will become payable upon the lapse of time and not a contingent liability[.]'" *M. W. Kellogg Co.,* 157 W.Va. at 770, 204 S.E.2d at 66 (quoting *Minotti v. Brune and Dunbar Land Co.*, 94 W.Va. 181, 188, 118 S.E. 149, 151 (1923) (citation omitted)). It is clear from the record that the petitioner remitted monthly payments to Tele-Response from the inception of the Services Agreement entered into nearly a year before it received the respondents' suggestion. The expected and routine aspect of these monthly payments is reflected in Mr. DeBiasi's testimony below, when he explained that Tele-Response "invoice[s] us for the Services Agreement typically on a monthly basis. It may . . . turn out to be a couple times a month, but we prefer monthly invoices." Thus, while the amounts of these invoices changed monthly, the obligation did not. Therefore, we agree with the circuit court that under the reasoning expressed in *Commercial Bank of Bluefield*, these monthly payments were fixed.

The petitioner also asserts that these monthly payments could not be reached by the respondents' suggestion because they were to be passed on by Tele-Response to third-party vendors. A similar argument was raised and rejected in *Rice v. American Communications Consultants of North America, Inc.*, 31 P.3d 1075 (Okla. Civ. App. 2001).

16

In *Rice*, the judgment debtor, Tele-Solutions, Inc., resisted a suggestion brought by its judgment creditor, Costwatch Consulting Group, against a third-party, Hertz Technologies, Inc., which owed money to Tele-Solutions. Like the argument advanced by the petitioner in the case at bar, Tele-Solutions asserted that

> it was an agent of certain other third parties, and the money Tele-Solutions was owed by Hertz represented the commissions owed to those third parties, and did not belong to Tele-Solutions. In other words, Tele-Solutions claimed that the moneys owed to it by Hertz belonged not to Tele-Solutions, but to the principals that Tele-Solutions represented. Therefore Tele-Solutions claimed the money owed to it was exempt from Costwatch's garnishment action.

*Id.* at 1076. In determining that the sums held by Hertz were not exempt from garnishment, the court observed that there was "no evidence that Hertz owed money to any of Tele-Solutions's subagents directly." *Id.* at 1076. Similarly, in the case at bar, there is no evidence that the petitioner owed money directly to any of Tele-Response's vendors.

The petitioner also points out that the respondents have no greater rights against it than does Tele-Response. Indeed, as we explained in *Strauss,* "[a] fundamental principle is, that an attaching creditor can acquire no greater right in attached property than the defendant had at the time of the attachment." *Strauss*, 7 W.Va. at 374. In *Rice*, the court likewise observed that the judgment creditor, Costwatch, had

> the same, but no greater, rights to collect the money held by Hertz than Tele-Solutions ha[d] to collect the money from Hertz. . . Costwatch may take whatever action is necessary to require Hertz to pay Costwatch instead of Tele-Solutions. What . . .

17

> Tele-Solutions has failed to show by any authority, is that Costwatch is obligated to assume the liabilities that Tele-Solutions may have to other, third parties.

*Id.* at 1077. Here, the petitioner has not shown that either it, or the respondents, had any obligation to Tele-Response's vendors or lien holders.

We now turn to the petitioner's argument that the payment it made to Tele-Response under 1(b)(iii) of the Services Agreement was to be used by Tele-Response to pay superior lien holders, namely the IRS and Mr. Dresnok. Mr. DeBiasi testified below that the petitioner made the paragraph 1(b)(iii) payment early[18] because of Tele-Response's cash flow issues without any mention of superior lien holders. Nearly three years later, he stated in his affidavit that this particular money was to be used by Tele-Response to pay the IRS and Mr. Dresnok. The Services Agreement, however, is silent in that regard.

In *Rice*, the court also addressed an argument regarding superior liens. The court noted the absence of evidence that the subagents possessed any superior liens that would give them priority to any of the money obligations between Hertz and Tele-Solutions, emphasizing that "[n]one of the . . . subagents who were allegedly owed the money filed any objection or appearance in the case." *Id.* at 1076 n.3. In the current matter, after nearly four years of litigation in this suggestion proceeding, neither the IRS nor Mr. Dresnok have

---

[18]A document produced by the petitioner below reflects that the petitioner remitted this $250,000 through a series of nine payments made between July 2012 and March 2013.

18

appeared to either oppose the suggestion or to seek that any garnished funds be paid to them rather than to the respondents.

The petitioner argues that a properly filed federal tax lien attaches to all property or rights to property of the taxpayer and has priority over other lien holders under 26 U.S.C.A. § 6323.[19] Its evidence of this properly filed federal tax lien against Tele-Response includes an exhibit to Mr. DeBiasi's affidavit, which is a list of monthly payments that he avers were made by Tele-Response to the IRS between December 2012 and July 2014,[20] as well as exhibits to the various agreements discussed above, which show an indebtedness owed to the IRS by Tele-Response. Critically, however, under 26 U.S.C.A. § 6323(a), a federal tax lien "shall not be valid as against any . . . judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the

---

[19]The petitioner relies upon *Little Audrey's Transportation Company, Inc. v. Beverly Bank*, 236 F. Supp. 352 (S.D. Ill. 1964). In that case, a notice of tax lien was filed against James Westerfield on July 26, 1961, and again on May 1, 1962. The bank obtained a judgment against Mr. Westerfield on March 6, 1962, and served a summons of garnishment on Little Audrey's on May 8, 1962. The court found that the notice of tax lien had priority over the judgment lien, explaining that "[t]he federal tax liens attached to the property . . . *when the notices of liens [were] filed* in Rock Island County" and that "*the notices of liens filed in that County were effective notice to third parties.*" *Id.* at 353 (emphasis added). In the instant matter, there is no evidence of when, or even if, a notice of an IRS tax lien against Tele-Response was filed or recorded anywhere.

[20]Mr. DeBiasi stated in his affidavit that the money Tele-Response used to make these payments to the IRS, as well as the monthly payments to Mr. Dresnok over the same time period, was paid to Tele-Response by the petitioner under paragraph 1(b)(iii) of the Services Agreement. The total sum of these payments exceeds $600,000, whereas the payment required under paragraph 1(b)(iii) was in the amount of $250,000.

19

Secretary."[21] Subsection (f) provides for the manner by which "[t]he notice referred to in subsection (a) shall be filed[,]" including that the notice of lien be recorded in accordance with state law. As the respondents aptly observe, the materials produced by the petitioner below do not include a copy of a recorded notice of an IRS lien against Tele-Response that would meet the requirements of 26 U.S.C.A. § 6323, let alone a certified copy of such notice that would meet the requirements of West Virginia Rule of Civil Procedure 56(e). *See* W.Va. R.Civ.P. 56(e) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.").[22]

Turning to the alleged Dresnok judgment lien, attached to Mr. DeBiasi's affidavit are various materials, including a complaint that seeks a confession of judgment against Tele-Response. There is no indication on the complaint that it was actually filed in the Court of Common Pleas of Philadelphia County, Pennsylvania, nor is there a term of court or an action number on the complaint, although there is a space provided for both. These materials also include a document titled "Notice" that is on the letterhead of the Office of Prothonotary of the Court of Common Pleas in Pennsylvania, which is addressed to Tele-Response, advising that a judgment by confession had been entered against it and in favor

---

[21]The cases cited by the petitioner to argue the superiority of the IRS lien are distinguishable as those cases involved recorded notices of federal tax liens. There is no evidence in the record before us of a recorded notice of IRS lien against Tele-Response such that it would be superior to the respondents' judgment lien under 26 U.S.C.A. § 6323.

[22]Regardless of whether the respondents raised this precise issue below, it was the petitioner's responsibility to meet the requirements of Rule 56.

of Joseph Dresnok. This notice is unsigned and similarly fails to include a term of court or case number in the space provided for such information. Absent from these materials is an actual judgment order from the Pennsylvania court, although entry of judgment is contemplated under court rules. *See* Pa. R. Civ. P. 2956 ("The prothonotary *shall enter judgment* in conformity with the confession.") (emphasis added). If the unsigned notice is a "judgment" under Pennsylvania law, the petitioner has not asserted as much. Further, even if there were a valid Pennsylvania judgment, there is no evidence in the record that Mr. Dresnok recorded his judgment anywhere. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 4303(a) (2004) ("Any judgment or other order of a court of common pleas for the payment of money shall be a lien upon real property . . . . when it is entered of record in the office of the clerk of the court of common pleas of the county where the real property is situated, or in the office of the clerk of the branch of the court of common pleas embracing such county.").

Neither the IRS nor Mr. Dresnok opposed the respondents' suggestion or attempted to enforce their liens by garnishing or levying against the amounts the petitioner owed to Tele-Response. Although the petitioner contends there was no reason for either the IRS or Dresnok to attempt to execute on their liens because Tele-Response was paying on those liens, as the court stated in *Little Audrey's*, the bank's "judgment was not a lien upon Westerfield's personal property in the hands of plaintiff until the garnishment summons was served." 236 F.Supp at 353. Had these other lien holders served suggestions upon the petitioner around the same time as the respondents, then the priority of those competing

21

suggestions would have been an issue. *See* 38 C.J.S. *Garnishment* § 233 ("Several garnishments issued against the same garnishee on behalf of different creditors to reach the same property or fund have priority according to time, determined by the time of service of the writ or summons on the garnishee."). Further, if the instant proceeding had been a creditors' suit brought under Chapter 38, Article 3 of the West Virginia Code, a commissioner would have been charged with marshaling and determining the priorities of all lien holders of record. *See* W.Va. Code § 38-3-12 (2011) ("The commissioner . . . shall . . . proceed to ascertain and report all the liens, on the real estate or any part thereof of the judgment debtor, the holders of such liens, the amount due to each, and the priorities thereof[.]"). The petitioner has not cited any West Virginia law that requires a similar marshaling or prioritizing of liens in a suggestion proceeding.

In summary, West Virginia Code § 38-5-10 provides for suggestion upon unmatured debts. *See Commercial Bank of Bluefield*, 175 W.Va. at 594, 336 S.E.2d at 558 ("W.Va. Code, 38-5-10 [1931] clearly provides for the garnishment of unmatured debts: '. . . which debt or liability could be enforced, when due, or which property could be recovered, when it became returnable[.]'"). We agree with the circuit court that the petitioner's payment to Tele-Response under paragraph 1(b)(iii) was fixed and not contingent. We also agree that the evidence demonstrates that the petitioner's monthly obligations to Tele-Response were fixed with only the amounts being unknown. *See Commercial Bank of Bluefield*, 175 W.Va. at 594, 336 S.E.2d at 557-58 (quoting *Johnson v. Johnson*, 300 A.2d 642, 645 (1973))

22

("'Where an obligation to pay exists, even though the amount of that obligation is undetermined, garnishment will lie where the amount is capable of definite ascertainment by the contract, or by the facts then known, or by testimony to be taken'"). Further, it is clear from the appendix record that the monies the petitioner paid to Tele-Response after the petitioner was served with the respondents' suggestion[23] greatly exceed the amount of the respondents' judgment lien. Accordingly, under these particular facts, we affirm the circuit court's summary judgment ruling in favor of the respondents.[24]

### B. Whether the petitioner was entitled to a jury trial

---

[23]We previously explained that "[a] summons of garnishment . . . is a warning to the garnishee not to pay the money or deliver the property of the judgment debtor in his hands, upon penalty that if he does he may subject himself to personal judgment." *Commercial Bank of Bluefield*, 175 W.Va. at 592, 336 S.E.2d at 555 (1985) (quoting *Lynch v. Johnson*, 84 S.E.2d 419, 421 (Va. 1954)). It appears the petitioner did not take any steps to protect itself from paying both Tele-Response and the respondents, such as seeking to deposit the disputed funds with the circuit court. *See, e.g.*, *Radiotelephone Co. of Indiana, Inc. v. Ford,* 531 N.E.2d 238, 243-44 (Ind. Ct. App. 1988) ("Wilgro [garnishee] could easily have protected itself against the threat of a double payment by depositing the disputed funds with the court."). Instead, the petitioner resisted the respondents' suggestion for years while simultaneously paying millions of dollars to Tele-Response.

[24]The circuit court observed in its summary judgment order that the Proceeds Agreement contained an indemnification clause through which Telestar, Tele-Response, TRC, and Jason Fine agreed to indemnify the petitioner for satisfying any debt obligation owed by Tele-Response that it had failed to disclose. Because the respondents' judgment lien was not disclosed by Tele-Response, the circuit court stated that the "indemnification provision was put into place to protect iPacesetters from just such a situation." Whether the petitioner can or has sought indemnification under the Proceeds Agreement is not an issue in this appeal.

23

The petitioner asserts that summary judgment was improper because it was entitled to a jury trial under West Virginia Code § 38-5-18. Under this statute, if disputes exist as to the disclosure of debts or liabilities due, such issues must be determined by a jury.[25] Because the petitioner answered the respondents' suggestion by denying that it owed any debt or obligation under the suggestion, the petitioner contends that it was for a jury to determine whether the payments it made to Tele-Response for services provided by third-party vendors were fixed obligations such that they would be subject to suggestion.

Voicing a countervailing position, the respondents assert that the right to a trial in suggestion proceedings under West Virginia Code § 38-5-18 is not absolute. Maintaining the petitioner failed to demonstrate the existence of any genuine issue of material fact to be determined by a jury, the respondents argue that the only issues in dispute were legal in nature. They further assert that neither West Virginia Code § 38-5-18 nor Rule 56 of the West Virginia Rules of Civil Procedure change the basic legal tenant that contract interpretation is reserved to a court, making the nature of the petitioner's obligations to Tele-Response a question of law.

The provision for a jury trial under West Virginia Code § 38-5-18 contemplates an insufficient factual development or a dispute involving the facts surrounding the suggestee's failure to honor a suggestion of personal property. In such instances, the statute

---

[25]*See supra* note 14.

24

requires a jury to make such determinations of fact. In the case at bar, however, the parties developed a significant and undisputed record regarding those factual issues, leaving no issues of material fact for jury determination. Moreover, "judicially-created rules relating to the function of the judicial branch of government, such as the West Virginia Rules of Evidence, will always trump any legislatively-created statutes." *State ex rel. Marshall Cty. Comm'n v. Carter*, 225 W.Va. 68, 78, 689 S.E.2d 796, 806 (2010) (Workman, J., concurring). Further,

> [i]t has long been well-settled that this Court "shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law." W.Va. Const. art. 8, § 3. Likewise, "[u]nder article eight, section three of our Constitution, the Supreme Court of Appeals shall have the power to promulgate rules for all of the courts of the State related to process, practice, and procedure, which shall have the force and effect of law." Syllabus Point 1, *Bennett v. Warner*, 179 W.Va. 742, 372 S.E.2d 920 (1988).

*Carter*, 225 W.Va. at 78, 689 S.E.2d at 806; *see also* W.Va.R.Civ.P. 1 ("These rules govern the procedure in all trial courts of record in all actions, suits, or other judicial proceedings of a civil nature whether cognizable as cases at law or in equity . . . . They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). Consequently, while West Virginia Code § 38-5-18 provides for a jury trial when there is a question as to whether the party being suggested has fully disclosed its debts or liabilities to the judgment debtor, here, the circuit court correctly determined that

25

> the facts surround the debts or liabilities, or as to the payment or delivery, have been sufficiently developed and the question as to whether such payments were "fixed" or "contingent" is a question of law for the Court.

> The jury is a fact finder. This Court does not believe that W.Va. Code § 38-5-18 supersedes, or was meant to supersede, this Court's role and duty under Rule 56 of the West Virginia Rules of Civil Procedure to decide questions of law . . . when there is no genuine issue of material fact.

Although the petitioner contends that whether the petitioner's contractual obligations to Tele-Response under the Services Agreement were "fixed" or "contingent" is a question of material fact for a jury's determination, we disagree. Answering that question was not a factual determination but an application of the law to the undisputed facts. *See* Syl. Pt. 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992) ("'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)."). And, as we have long held, "[i]t is the province of the court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937). Consequently, we find no error in the circuit court's employment of West Virginia Rule of Civil Procedure 56 for resolution of this legal issue.[26]

---

[26]To the extent any of our reasoning herein differs from that set forth in the circuit court's summary judgment order, as we have long held, "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal

(continued...)

## IV.  Conclusion

For the foregoing reasons, the circuit court's August 11, 2016, order awarding summary judgment in favor of the respondents is hereby affirmed.

Affirmed.

---

[26](...continued)
ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment."  Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965).